STATE OF NEW JERSEY, DEFENDANT IN ERROR, v. ALEX-
ANDER SCOTT, PLAINTIFF IN ERROR.

Submitted December 9, 1913—Decided April 20, 1914.

1. In interpreting a statute due regard should be paid to the condi-
tion it was intended to remedy.
2. Section 5a, 2 *Comp. Stat. p.* 1744, which provides: "Any per-
son who shall, in public or private, by speech, writing, print-
ing or by any other mode or means advocate the subversion and
destruction by force of any and all government, or attempt by
speech, writing or printing or in any other way whatsoever to
incite or abet, promote or encourage hostility or opposition to any
and all government, shall be guilty of a high misdemeanor," does
not include within its terms or 'meaning one who denounces, in a
newspaper article, the action of the police in suppressing a strike
and the municipality for countenancing such action.
3. The language, "promote or encourage hostility to any and all
government," refers to the advocacy of anarchy, and the phrase
"any and all government" cannot be separated so as to include
hostility or opposition expressed to particular administrations.

On error to the Passaic Quarter Sessions.

Before GUMMERE, CHIEF JUSTICE, and Justices PARKER
and KALISCH.

For the plaintiff in error, *Henry Carless.*

For the state, *Michael Dunn.*

The opinion of the court was delivered by

KALISCH, J. The main question presented for solution by
this record is whether the indictment, based on section 5a of
the Crimes act (*Comp. Stat., p.* 1744), upon which the
plaintiff in error was tried, convicted and sentenced, charges
any of the criminal offences denounced by that section.

The section reads: "Any person who shall, in public or
private, by speech, writing, printing or by any other mode or

means advocate the subversion and destruction by force of any and all government, or attempt by speech, writing, printing or in any other way whatsoever, to incite or abet, promote or encourage hostility or opposition to any and all government, shall be guilty of a high misdemeanor and punished by a fine not exceeding two thousand dollars, or imprisonment at hard labor not exceeding fifteen years, or both."

The indictment contains three counts. The first count charges that the plaintiff in error "being a wicked, malicious and evil-disposed person, and contriving and intending the peace of this state to disturb, and to bring the government of the city of Paterson, a municipality recognized by the laws of this state, into great hatred and contempt, did in public attempt to incite, abet, promote and encourage the citizens of said state, residing in the said city of Paterson, to hostility and opposition to the said government of the said city of Paterson, in this state, by writing, printing, publishing and causing to be written, printed and published, in a certain public newspaper called 'The Weekly Issue,' certain scandalous and malicious words of the tenor following: 'Police Chief Bimson Overrides Constitution. Chief of Police and his Strike Breaking Force Brutally Attack Peaceful Strikers.' 'Bimson, the boss strike breaker.' 'The police of Paterson, headed by their brave Chief Bimson, having taken charge of Paterson, and are running things to suit themselves. The halls of striking mill workers are raided, their meetings broken up and helpless men, women and children are brutally clubbed, cuffed and manhandled right on the streets. The mill workers of Paterson struck against the four-loom system which is grinding out their health and lives. They peacefully walk out of the mills and quit work. For doing this terrible thing the police of Paterson, at the behest of the silk manufacturers, rushed at the defenseless workers like a bunch of drunken Cossacks and savagely attacked them. Outside of barbarous Mexico and Russia, there are few places that have witnessed such police brutality and lawlessness. Paterson was once famous as the City of the Reds, the home of anarchists. These anarchists talked a whole lot and made

some noise, but they never harmed a hair on anyone's head. Now, Paterson had become infamous as the City of the Blues, the hotbed of brass-buttoned anarchists. These police anarchists, headed by the Boss Anarchist Bimson, not only believe in lawlessness, but they practice it. They don't waste words with workingmen, they simply crack their heads. With them, might is right. They swing the mighty club in their right hand, and if you don't like it, you can get the hell out of Paterson. This is anarchism of the worst kind. The police of Paterson are doing themselves proud as strike breakers. Chief Bimson is priding himself on the fact that he had nipped the strike in the bud by spilling the blood of the mill workers. The Paterson police have become professional strike breakers. The workers of Paterson pay the salaries of the police, and yet their hired servants turn upon them as strike breakers. Will the workers of Paterson stand for this?'

" 'Suppose the manufacturers locked out the workers and closed their factories until the workers were almost starved to death. Would the police of Paterson rush into the rooms of the Silk Manufacturers' Association, break up their meetings and crack the fat skulls of the manufacturers? Not so as you could notice it. Why? Because money talks. And money owns the city of Paterson, including the police,' and thereby he, the said Alexander Scott (plaintiff in error), then and there wickedly, unlawfully and maliciously attempted to encourage hostility and opposition to the government of the city of Paterson, contrary to the form of the statute," &c.

The second count is almost exactly like the first, differing therefrom only in this particular, that the acts are charged to have been committed in *private,* by the plaintiff in error, instead of in *public.*

The third count is practically like the first and second, with the exception that it charges the incitement, abetting, &c., to have been committed by a different method, namely, "by circulating and causing to be circulated a certain public newspaper called 'The Weekly Issue,' in which was printed certain scandalous and malicious words," &c.

The plaintiff in error moved to quash the indictment upon the ground that it was insufficient in law, in that it failed to set out the elements necessary to bring it within the language and design of the act upon which it was founded. The more specific ground urged was that the statute was aimed to pre-vent the dissemination of anarchism and not to prevent pro-test against and criticism of government. The motion to quash was refused, to which an exception was taken, and at the close of the state's case, plaintiff in error moved for a direction of a verdict for acquittal upon like grounds, which was also refused and an exception was taken and allowed. The state relied upon proof of the publication of the article and its circulation in the public streets of Paterson to estab-lish its case. The plaintiff in error put in no defence. The case is here on a strict bill of exceptions and under the one hundred and thirty-sixth section of the Criminal Procedure act.

It is no doubt true, as has been elaborately argued by coun-sel for plaintiff in error, that the statute, of which the para-graph above quoted is a component part and solely involved in the consideration of the validity of the indictment and sub-sequent proceedings thereon, was the resultant product of feverish and political excitement caused by the assassination of the late President McKinley. If so, the rule is applicable that courts, in interpreting such a statute, will pay due regard to the conditions and circumstances existing at the time it was brought into life in order to get at its true meaning and purpose. As Blackstone tersely expresses it, in laying down rules for the interpretation of statutes, due regard must be had to the old law, the mischief and the remedy. And we must not lose sight of the fact that the great danger in enact-ing statutes under the stress of great public excitement and pressure, is that such legislation is very apt to reflect the crude and undigested sentiment of a public upheaval at the cost of encroachments on constitutional rights. It has been argued, by counsel for plaintiff in error, that the statute is in violation of that paragraph of the state constitution which provides: "Every person may freely speak, write and pub-

lish his sentiments on all subjects, being responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press." But it is to be observed that those who abuse the guaranteed rights are left amenable to the law. And so, also, it is a reasonable inference that the legislature has clearly the power to pass laws providing for the punishment of those who abuse these constitutional privileges. Our entire body of legislation, from the time of our first state constitution up to the present day, furnishes plenary evidence of it. We will find this statement exemplified in our law of libel, in statutes punishing the writing and dissemination of obscene literature, in sending threatening letters, in challenging one to fight a duel, the advising or counseling to commit offences involving moral turpitude, &c., &c. It would be a sheer impossibility to protect the peace, morals, health and safety of the community, unless the abuse of the privileges guaranteed by the constitution was subject to legislative control and action. The disposition of this case will not depend on any view that we may entertain respecting the constitutionality of the act, and upon which no opinion is hereby intended to be expressed, but rather upon the determination of the first vital question presented, which is, Do the facts of the indictment constitute a violation of the statute? If they do not, the plaintiff in error was entitled to succeed on his motion to quash the indictment, and that being denied, he was entitled to succeed on his motion to direct a verdict of acquittal.

A plain reading of the paragraph of the statute makes it clear that it intended to include two classes of cases—*first,* where the subversion and destruction of *any and all government by force* was either in public or private, by speech, writing, printing or by any other mode or means advocated; *second,* where an attempt is made by speech, writing, printing, or in any other way, to incite, abet, promote or encourage *hostility or opposition to any and all government.*

It is on the latter clause of the paragraph of this statute that the indictment is attempted to be supported.

The contention of counsel of the state is that though the language of the article and its circulation constituted an attempt by writing, and so forth, to encourage hostility and opposition to the government of the city of Paterson, nevertheless, it came within the meaning of the words "any and all government." The argument made in support of this is that the word "any" should have a specific meaning as distinguished from the word "all"—for the hostility might be against one or more and not against all. In short, to encourage hostility or opposition to the government of any political division of this state constituted a high misdemeanor. But to adopt this view would violate the plain sense of the words themselves. Moreover, such a construction would render the act clearly unconstitutional. The natural results flowing from such an interpretation would be to prevent all free discussion relating to a change in the administration of municipal and state governments, for such a change would involve, more or less, expressions of opposition or hostility to the government that was sought to be ousted. It would preclude fair criticism on the conduct of public officials entrusted with the administration of governmental affairs. It would silence the public press and preclude it from bringing into the light of day the evil spots in the administration of municipal and state affairs, and delinquency of public officers entrusted with the discharge of important public duties, &c., &c. It is difficult to comprehend how any municipal or state election could be held without a campaign of rostrum orators and newspaper editorials voicing and advocating their opposition or hostility to the government that they were seeking to displace. No one would be safe in advocating opposition or hostility to any foreign government without incurring the penalty of the act. Thus, it is evident that no such meaning can be reasonably attributed to the words "any and all government."·

What the legislature aimed at is fully expressed by the term "any and all government." It intended to suppress the advocacy of anarchy. The obvious meaning of the language "to

incite or abet, promote or encourage hostility or opposition to any and all government," is to incite, abet, promote or encourage lawlessness—that is, a state or condition of society where every man's will is a law unto himself.

The vice of anarchy is not so much in the belief of a state or condition of society where there is no law or supreme power, but rather in the promotion and encouragement of disobedience to and contempt of existing laws; such disobedience and contempt constituted in themselves indictable offences at common law.

The newspaper article, which was made the ground work of the indictment, is couched in hot and intemperate language, and is obviously a most caustic and scathing arraignment of the police department and force of the city of Paterson; and does, among other things, charge the officials administering the governmental affairs of the city with being corrupt and venal. Although it may be that the article is libelous, and the author and publisher thereof subject to indictment for libel, it cannot be fairly said that it, either in tone or spirit, advocates hostility or opposition to any and all government. At the most, it evinces a deep animosity against the city government of Paterson, for alleged maladministration in governmental affairs, but beyond that it does not go. And that is not enough to bring it within the language or spirit of the section of the Crimes act invoked in this case. The indictment is palpably without any legal force. The trial judge should either have quashed it or directed a verdict of acquittal.

The judgment will be reversed.